UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DONALD F. MURRAY
392 Holley Street
Brockport, New York 14420                                    **JURY TRIAL DEMANDED**

            Plaintiff,
                                                             Civil Action No.: _____
v.

STATE UNIVERSITY OF NEW YORK
STATE UNIVERSITY COLLEGE AT BROCKPORT,
ERICK HART, and
KATHRYN WILSON

            Defendants.

_____

## COMPLAINT

        Plaintiff Donald F. Murray, by and through his attorneys, Zdarsky Sawicki & Agostinelli

LLP, for his complaint against defendants, states and alleges as follows:

### JURISDICTION AND PARTIES

        1.      This suit is brought for injunctive relief and damages jurisdiction lies pursuant to

42 U.S.C. §1983 and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §623, et

seq. and *Ex Parte Young*, 209 U.S. 123 (1908).

        2.      The following conditions precedent to jurisdiction under §706 of Title VII, 42

U.S.C. §2000e-5(f)(3) have occurred or have been complied with: (a) charges of employment

discrimination on the basis of age, hostile work environment, and retaliation were filed on May

26, 2021 with the Equal Employment Opportunity Commission ("EEOC") within three hundred

days of the commission of  the unlawful employment practices alleged herein, which Plaintiff

allege continue to this date; (b) this complaint is being filed within ninety (90) days of plaintiff's receipt of EEOC's April 21, 2022 Determination and Notice of Right to Sue on Charge 16G-2021-02518, with notice of dismissal and right to sue to proceed any further with this matter, as set forth in EEOC's notice, from Holly Shabazz, S/L Tribal Program Manager, mailed to Plaintiff and his counsel on April 21, 2022.

3.      Plaintiff, Donald F. Murray ("Murray"), is a citizen of the United States, the State of New York, and the County of Monroe.

4.      Upon information and belief, all the discriminatory employee practices herein were committed within the State of New York, County of Monroe.

5.      Defendant State University of New York, State University College of Brockport ("SUNY Brockport" or the "University") is a State University College within the State University of New York system.

6.      Defendant Erick Hart is sued herein in his official capacity, as SUNY Brockport's Athletic Director.

7.      Defendant Dr. Kathryn "Katy" Wilson is sued herein, in her official capacity, as SUNY Brockport's Vice President for Enrollment Management and Student Affairs.

8.      On August 18, 2021, Murray, a tenured faculty member and Head Wrestling Coach at SUNY Brockport for fifty years, filed a Verified Administrative Complaint with the New York State Division of Human Rights ("DHR"), jointly filed, pursuant to New York's agreement with the United States Equal Opportunity Commission ("EEOC"), charging SUNY Brockport with unlawful discriminatory practices relating to employment (age and retaliation)  in violation of the New York Human Rights Law (DHR Case Number 10213057, Federal Charge Number

16GC102518).

9.      On January 13, 2022, DHR determined that it had jurisdiction over Plaintiff's Administrative Complaint, but concluded no probable cause existed to believe that Respondent engaged in an unlawful discriminatory practice – a conclusion which Plaintiff disputes with respect to all of his claims and rights.

10.      Murray filed a prior, separate Complaint directly with EEOC, digitally signed May 26, 2021 and filed, upon information and belief, that same day  (Agency Charge No. 525-2021-01020), charging that he was then employed by SUNY Brockport, and since 2017, has been subjected to harassment from SUNY Brockport Athletic Director Erick Hart and Vice-President Dr. Katy Wilson and that on September 12, 2020, Erick Hart and Dr. Kathryn "Katy" Wilson initiated an investigation into Murray and the SUNY Brockport Wrestling program in an attempt to remove Murray as a Head Wrestling Coach and Associate Professor, with the additional intentions of dissolving the Wrestling program, while contemporaneously asking Murray when he was going to retire, along with other age-related comments, then took additional actions against Murray in an designed effort to compel Murray to step down as Head Coach and to eliminate the SUNY Brockport Wrestling program.

11.      In his separate EEOC Complaint, referred to as a basis for a retaliation claim in his August 18, 2021 DHR Complaint which, upon information and belief, was merged for consideration by EEOC with his New York DHR Administrative Complaint, Murray alleged that he believed he has been discriminated and retaliated against because of his age (then 77), in violation of the Age Discrimination in Employment Act of 1967.

**BACKGROUND AND FACTS SUPPORTING ALL COUNTS**

12.     During their first meeting together in 2013, Hart noted Murray's age and inquired of Murray as to when he planned to retire, noting Hart's intention to replace Murray with an individual from Penn State in the position of Head Wrestling Coach at SUNY Brockport, stating that "I can get a young coach now from Penn State who would be attracted to a Head Coaching position, not an Assistant Coaching position. I would like you to retire and you can help me with other duties within the Athletic department."

13.     Murray replied that he had no intentions of retiring during this meeting.

14.     This marked just the first instance, known to Murray, of Hart making Murray's age and retirement an issue, followed since then by action Hart and others took against Murray to force his retirement.

15.     In September 2017, Murray aired his grievances to Hart in a meeting regarding disparate treatment of Murray and the Wrestling program across multiple areas of operation, specifically questioning Hart's apparent preference for younger coaches.

16.     Upon receiving a minimal collaborative response from Hart regarding the issues in question, Murray rose to leave Hart's office, at which point Hart stated, "if you don't like it, you don't have to be here," and that "you [Murray] will get the message."

17.     Actions taken by Hart against Murray leading up to this meeting as well as the actions taken subsequently following this meeting are the fulfillment of this "message" to Murray, unlawfully discriminating against Murray based upon his age.

18.     Hart's pattern of discriminatory acts included taking specific action against Murray and the Wrestling program to target Murray while turning a blind eye to other athletic programs helmed by younger coaching staff that were engaging in similar behavior.

19.     Hart's attacks culminated in both a University and NCAA investigation.

20.     The University investigation began on September 12, 2020.

21.     The University investigation, initiated upon pretext, resulted in full exoneration of Murray and the absence of any University disciplinary action.

22.     A final effort to drive Murray out of coaching and into retirement was initiated via the NCAA investigation.

23.     Despite no negative performance reviews in 51 years, the University "self-reported" Murray and the University Wrestling Program to the NCAA.

24.     SUNY Brockport submitted a form of the recommended list of penalties provided to the NCAA by the University as part of the NCAA's Summary Disposition process.

25.     SUNY Brockport's recommended penalties served as a de facto termination, removing Murray from coaching for three years among other repercussions.

26.     The excessive sanctions recommended by SUNY Brockport were grossly out of proportion to the weight of the little evidence developed through the University's investigation.

27.     The true sole purpose of the investigation against Murray was unlawfully discriminating against Murray in his employment by SUNY Brockport.

28.     Wilson orchestrated SUNY Brockport's unlawful discriminatory actions against Murray, through Erick Hart, her subordinate.

29.     On three separate occasions, Wilson revealed her oversight of Hart's unlawful discriminatory actions against Murray, first in connection to the university investigation, second in connection to the NCAA investigation, and thirdly in connection to a letter sent by Regan Johnson ("Johnson"), an alumnus of the program.

30.     Wilson planned and approved the University investigation of Murray and the Wrestling program, which was intended to force Murray into retirement.

31.     Wilson's connection to the scheme to remove Murray is evident from a phone call made by Hart to Murray on Saturday, September 12, 2020, in which Hart noted a call from Wilson prior to announcing the investigation to Murray (corroborated by phone log).

32.     In the announcement, Hart notified Murray that: (i) a University investigation was being undertaken in response to allegedly documented violations, which were false and later proved as such; and (ii) a national press release would be published in under two hours.

33.     Defendants' scheme to take down Murray, as devised and implemented September 12, 2020, included coordinated action by Susan Hoffman ("Hoffman"), SUNY Brockport's Associate Athletic Director, and Tamara Gouger ("Gouger"), SUNY Brockport's Human Resources Director.

34.     Gouger and Hoffman met with Murray in his office immediately following Hart's September 12, 2020 meeting with Murray to serve HR's official notification that he was being placed on alternate work assignment until further notice and that the SUNY Brockport Wrestling Program was being placed on interim suspension.

35.     Gouger instructed Murray to avoid contact with any individual associated with the University, including faculty, staff, and students.

36.     Following Gouger and Hoffman's delivery of HR's letter, Murray was escorted to his vehicle and instructed to leave campus and not enter the campus again until the investigation had concluded.

37.     No discussion was held with Murray prior to this exchange, despite Murray's long tenure at the university.

38.     Given these occurrences on a Saturday morning at approximately 10:00 a.m., the presence of the aforesaid University officials on campus indicates a premeditated, concerted attack on Murray.

39.     The phone call between Hart and Wilson shows active coordination between the two throughout the University's investigation.

40.     In regard to the NCAA investigation, Wilson blocked Peter Dowe ("Dowe"), University Registrar, from serving as a representation for Aaron Wilkinson ("Wilkinson") for his interview for the NCAA investigation.

41.     Upon information and belief, Wilson called Dowe to instruct him not to serve as Wilkinson's representation, corroborated by Dowe's email to Murray.

42.     Upon information and belief, Hart immediately notified Wilson when Dowe accompanied Wilkinson for his interview.

43.     Hart's swift call to Wilson and Wilson's edict barring Dowe from representing Wilkinson, within an hour of the phone call, shows active collaboration between Hart and Wilson throughout the process.

44.     A third point of connection between Wilson and Hart can reasonably be inferred from Wilson's lack of response to a letter sent by Johnson, to Wilson, expressing Johnson's

legitimate concerns regarding the merits of the University investigation commenced under her supervision.

45.     No action was taken against Hart by Wilson following Johnson's letter, indicating her acquiescence, ratification, or implied approval of Hart's discriminatory actions against Murray.

46.     Wilson, like Hart, asked Murray when he planned to retire, made age-related comments, and took actions designed to force Murray into retirement.

47.     Hart treated Murray and the SUNY Brockport Wrestling Program differently than other similar athletic programs, with younger coaches.

48.     Hart accused Murray and the Wrestling Team of alleged violations, for actions and conduct undertaken by younger coaches, but minimal consequences were suffered by the younger coaches or their teams.

49.     Much of the conduct the University, Hart, and Wilson attributed to Murray never occurred.

50.     Hart engaged in a continuous pattern of disparate treatment towards Murray and the Wrestling Program.

51.     Upon initiation of the University investigation, the Wrestling program was placed on interim suspension and Murray was placed on alternate work assignment.

52.     The University's investigation was initiated based on allegations related to supposed COVID violations, including an "Ultimate Frisbee (UF)" game in which Wrestling team members allegedly participated, while not wearing masks.

53.     Despite its relatively inconsequential nature, the University used the UF as "evidence" to launch an investigation.

54.     If Hart and Wilson could use such allegations to sanction and possibly remove the Wrestling Program, by extension, they would also have been able to discard Murray.

55.     Murray self-reported a COVID exposure unrelated to the UF game, and implemented a day of precautionary quarantine, contact tracing, and COVID-19 testing.

56.     No members of the Wrestling Program tested positive for COVID-19.

57.     Following the University's investigation, the Wrestling Program was placed on conduct probation until December 2021 and was required to attend a social distancing workshop because of charges related to social distancing and facemasks.

58.     After eight weeks, Murray was reinstated as Wrestling Head Coach with no disciplinary action.

59.     Shortly after Murray's self-report of potential Covid exposure of a Wrestling team member, the University issued a national press release regarding alleged COVID-19 violations and an investigation, though before completing any actual investigation, without ever consulting Murray or the Wrestling coaching staff.

60.     The Wrestling Program and its coaching staff bore the full weight of the University's and its Athletic administration's focus in response to isolated events that pale in comparison to the egregious violations which occurred within other athletic programs helmed by younger coaches.

61.     Defendant Hart took little or no action against these other programs, including choosing not to self-report their violations, with no other circumstances comparable to the concerted effort to find Murray and the Wrestling program summarily guilty.

62.     SUNY Brockport engaged in discriminatory behavior, detrimental to Murray and the Wrestling program, while ignoring violations by programs run by younger coaches.

63.     Hart knew the Men's and Women's Cross-Country teams attended an off-campus house party in direct violation of campus policy the same weekend that the investigation regarding the Wrestling program began, confirmed by emails from Mrs. Fronczak, mother of a Wrestling student-athlete whose son was dating a member of the Women's Cross-Country team.

64.     The aforesaid teams had a positive COVID-19 case.

65.     Though certain members of the Cross-Country programs were placed in mandatory two-week quarantine, no additional testing occurred, but the University only acknowledged such violations when questioned by Spectrum News - no national press release was issued, no formal university investigation was undertaken against the programs, no NCAA investigations were conducted based upon self-reporting, and no repercussions were suffered by the younger coaching staffs of these programs.

66.     Hart knew the Men's Soccer program attended an off-campus house party with approximately 50-75 attendees, as confirmed by a response to a Freedom of Information Request – though the publicity surrounding the Soccer party forced the University to take some action, limited to individual suspensions for some student-athletes, and a suspension and  investigation against the Men's Soccer program, as reported in the Rochester Democrat & Chronicle.

67.     Comparing the University's limited actions against Cross- Country and Soccer athletes, taken only when prompted by negative publicity, without documented action taken against the coaching staff of those programs, with the heavy-handed actions taken by the University against the Wrestling Program, further illustrates SUNY Brockport's disparate treatment of Murray as Wrestling Head Coach.

68.     Hart knew and assisted with the early opening of SUNY Brockport's football stadium, one week prior to the semester, to allow student-athletes from various athletic programs, including football, to utilize the space, as confirmed in a letter from Marsha Oehlbeck ("Oehlbeck"), SUNY Brockport's Kinesiology, Sports Studies, and Physical Education (KSSPE) Secretary.

69.     Such action, also known to Dr. Mark Noll, despite restrictions laid out in the University's "Bring Brockport Back" plan, violated both NCAA and University policies regarding season start dates and the scheduled reintroduction of athletic activities.

70.     On September 4, 2020, Hart closed the Football stadium, citing lack of compliance of "four (4) different groups" with social distancing and facemask guidelines.

71.     Though multiple members of the coaching staff of the University's Football program, including Jason Mangone and Steve Potter, were caught weightlifting in the SUNY Brockport Athletic Weight room without masks by facilities staff, who took pictures of Mangone utilizing the space, no national press releases were issued, no formal university investigations was undertaken against the programs, no NCAA investigation was conducted, based upon self-reporting, and the coaching staffs of such programs suffered no consequences.

72.     Hart also knew the SUNY Brockport Ice Hockey program rented the Lakeshore Arena in Rochester to practice for two days per week prior to their playing and practice season, both during the Fall and Spring semesters, but he decided not to take action against them.

73.     When questioned by Murray, Hoffman stated that "they [Hockey] did it on their own…we [administration] had no idea that they were doing it," which is the apparent justification for lack of action on the part of the administration.

74.     Contrast Hart's aforesaid reaction regarding Hockey with the University and NCAA investigations of Murray and Wrestling based on allegations related to alleged usage of an external facility by Wrestling student-athletes – again, in comparison no national press release, no formal university investigation undertaken against the program itself, no NCAA investigation based upon self-reporting, and no repercussions for the coaching staff of the program.

75.     Hart knew the SUNY Brockport Men's Basketball Program violated COVID-19 travel restrictions related to bringing out-of-state athletes to campus and paying for their meals at Wegmans, yet no national press release ensued, no formal university investigation was undertaken against the program, no NCAA investigation commenced based upon self-reporting, and no repercussions were suffered by the Basketball coaching staff.

76.     Hart knew student-athletes were utilizing the Athletic Weight room, which had been shut down previously due to COVID-19 policies, per Mrs. Oehlbeck's letter.

77.     Despite confirming with Murray that Wrestling student-athletes had not been utilizing the space, Hart accused the Wrestling Program of using the space.

78.     There was no national press release, no formal investigation was undertaken against Football and other programs actually using the space and violating campus guidelines, and no repercussions were suffered by the coaching staff of the other programs.

79.     The University's double-standard between the treatment of Murray and the Wrestling program in comparison to other athletic programs on campus further illustrates Hart's intention to send Murray an unlawful age discriminatory "message," one that actively sought his retirement.

80.     The University's investigation that resulted in a national press release was based upon three charges: engaging in team practices, using campus facilities to engage in weightlifting without authorization, and unauthorized practices and/or gatherings without social distancing and not wearing face coverings.

81.     The Wrestling Program was found responsible for not wearing facemasks and social distancing during gatherings at the New York Wrestling Association for Youth (NYWAY) club (an independent off campus facility) and the outdoor ultimate frisbee (UF) game.

82.     Murray was cleared of all charges and fully reinstated as Head Coach and Associate Professor on November 2, 2020 (see reinstatement letter).

83.     Murray was also charged with COVID violations and possible NCAA violations in his wrestling courses, yet no conversation was held with Murray prior to the commencement of this investigation, which is unusual at best given his 50-year tenure at the University.

84.     The Wrestling program pleaded guilty following a recommendation from the program's advisor during the process, John Jackson ("Jackson"), Athletic Trainer.

85.     Jackson, who was appointed as advisor by Hoffman, eventually recommended that Wrestling plead guilty in order to avoid further charges from additional investigation with the interest of protecting the student-athletes from further discipline.

86.     In this scenario, the Wrestling student-athletes were collateral damage in the University's attempts to find Murray guilty and drive him into retirement.

87.     In regard to whether the Wrestling program was actually responsible for these charges, the policy that specified rules for attendance at external organizations by two or more Brockport student-athletes was never communicated with Wrestling staff or student-athletes, leaving them under the impression that attendance at the NYWAY club without facemasks and social distancing was acceptable given the New York State guidelines then in place.

88.     The University's Wrestling program investigation was initiated without probable cause, based, at best, upon conflicting information.

89.     If there had been concerns regarding Wrestling courses, taught for decades by Murray, conversations regarding the courses and their adherence to NCAA rules and regulations from an academic standpoint between Dr. Cathy Houston-Wilson ("Houston-Wilson") and the Athletic Department could have and should have occurred.

90.     No action was taken by SUNY Brockport's Athletics Department, then under Hart's command to communicate with Dr. Houston-Wilson and clarify allegations prior to the investigation, as clarification regarding the courses would have hindered the launch of the investigations and weakened the probable cause necessary to justify the investigation.

91.     Specific communications were made well in advance to these courses' commencement regarding how the courses in question would be conducted to remain in line with COVID-19 guidelines, as set forth in Murray's email, to Houston-Wilson.

92.     The University attempted to find Murray responsible for registering and/or encouraging students to register for the courses – a charge Murray disproved with letters from Houston-Wilson and Dowe, in which instructions to fill the courses were administered and the importance of encouraging student registration from a faculty standpoint was exhibited, respectively, as noted in emails from Houston-Wilson and Dowe.

93.     Charges regarding Wrestling courses were submitted based upon a fraudulent witness statement, which was eventually retracted.

94.     Hart ignored contrary evidence made fully available to Hart as he observed Murray teach the course for five minutes when Hart came to confront Murray regarding the weightlifting charge.

95.     Three letters, two from facilities staff and one from a mother of one of the wrestling student-athletes enrolled in the course, verified Murray's adherence to COVID-19 guidelines.

96.     Such first-hand observations by a student, staff, and Hart himself support the reasonable inference that this charge was incorporated into the University's investigation without probable cause.

97.     Two other charges, engaging in team practices and weightlifting without authorization, were also included without probable cause.

98.     Allegations in the charges against Murray were knowingly submitted as fact by Hart, despite clear evidence to the contrary.

99.     While the University claimed Murray was not authorized to attend the NYWAY club and had been notified accordingly, Murray had received prior express permission from Hoffman for the student-athletes to attend the NYWAY club.

100.    Despite documented permission granted to Murray and the Wrestling program, defendant Hart and the University proceeded, without probable cause, to launch an investigation based upon an allegation of "team practices."

101.    Though Murray had discussed the NYWAY club issue with Hoffman prior to the instigation of the University's investigation, despite this conversation and clarification that the Wrestling Program was not officially using the space, the false allegation was still included in the list of charges.

102.    The University's investigation was undertaken without probable cause, designed to find Murray and the Wrestling program summarily guilty, without an opportunity to be heard, to provide pretextual cover for the University's plan to remove Murray from coaching and force him to retire.

103.    The scheme to investigate and coerce Murray to retire, carefully planned over time, was put in motion after the alleged UF Covid violation flop.

104.    Murray was exonerated of all University charges and received no disciplinary action.

105.    Had the University used appropriate due diligence to review the facts, the University investigation would never have taken place, nor would the NCAA self-report and investigation have been conducted.

106.    Absent probable cause, logic dictates that the University and the individual Defendants had ulterior motives to undertake this investigation, including obvious age discrimination.

107.    Following the uneventful conclusion of the University's investigation, the University's Athletic administration deemed it appropriate to self-report to the NCAA, despite lack of actual standing as evidenced by the University investigation's conclusion, opting instead to base their submission on semantics, mischaracterizations, and outright falsehoods.

108.    While Murray was left in the dark regarding specific information self-reported to the NCAA by the University, arguments later made by the NCAA indicate that the previously disproved charges were submitted to the NCAA as fact, specifically related to permission received to attend the NYWAY club and the legitimacy of the Wrestling courses.

109.    While Murray was found responsible by the NCAA, based on the University Athletic administrators' self-report, additional factors must be considered in analyzing this investigation.

110.    The NCAA and the University had been working in tandem for months prior to engaging in the interview process with Murray.

111.    Intent on forcing Murray to retire, the University sought to portray Murray as guilty in any way possible, as indicated by the sudden appearance of a fourth NCAA charge related to medical examinations, which appeared following a meeting with Murray, Murray's

advisor during the meeting, Dr. Charles Callahan ("Callahan"), and University Athletic administrators Hart, Hoffman, and Dani Drews ("Drews"), Assistant Athletic Director.

112.    During the aforesaid meeting, the Athletic administrators attempted and failed to find Murray responsible for allowing a Wrestling student-athlete to engage in practice activities prior to being medically cleared.

113.    The University subsequently fed this allegation to the NCAA, as noted in an email by Murray's lawyer, Craig Johnson regarding addition of this new charge to the pre-existing three charges, which occurred following the meeting with the University's Athletic administrators.

114.    The NCAA then determined this new charge to be a violation contingent entirely upon the existence of the other previously disproven charges.

115.    The University readily agreed with all charges prepared by the NCAA, essentially admitting their guilt in the investigation and forcing the violations on Murray, despite the overwhelming evidence of his innocence and their inability to prove any charges against him in the University investigation.

116.    In order to fully commit to its position of guilt with the NCAA and seal Murray's fate, the University proposed an absurdly excessive list of penalties to be leveled against him, further solidifying their "regret" in allowing the proposed violations to occur under their supervision, implicating Murray in the process.

117.    Such actions exhibit a pattern of animosity towards Murray consistent with the University's continuous pattern of intentional discriminatory acts, undertaken with the ultimate goal of forcing out Murray.

118.     Hart's effort to push Murray into retirement is illustrated by the recommended list of penalties proposed by the University:

• "Suspended from all coaching activities for three academic years, (2021-22, 2022-23, 2023-24) including but not limited to all athletically related activities involving the wrestling program, recruiting, alumni events."
• "Ban from attending events with NCAA recruitable student-athlete participants (i.e. NYWAY tournament)"
• "'Gag' order on any communication related to NCAA violations or sanctions related to Brockport wrestling program."
• "Delay start date of wrestling team practice until Nov 15, 2021 (instead of October 10)"
• "No intercollegiate competition in the Fall 2021 semester"
• "Publicly announced the suspension of the head coach and placed a letter of reprimand in his file"

119.     Such excessive University-recommended sanctions served as a *de facto* termination of Murray.

120.     After the three years of sanctions, Murray will be 81 years old.

121.     At the time of his return, Murray would have recruited none of the student-athletes that he would be coaching and would be forced to start over, which, at the age of 81, the University calculated would not be worth Murray's time.

122.     If Murray had accepted the penalties, the "gag" order would have prevented him from speaking out regarding the horrendous treatment he has received at the hands of the University, all while a public reprimand is administered, further damaging his reputation.

123.     By delaying the start of 2021 competition season for the Wrestling Program and removing Murray as Head Coach, the program would likely underperform, providing additional

reason to remove the program and Murray as Head Coach permanently, in sync with Dr. Mark Noll's ("Noll") letter noting Wilson's intention to remove both Gymnastics and Wrestling to save costs.

124.    In a second iteration of recommended penalties, the University moved beyond the previous excessive sanctions, recommending the following against Murray and the Wrestling Program:

• "Brockport will not host intercollegiate wrestling competition in the Fall semester (2021-23). This includes canceling the Brockport opening weekend tournament tentatively scheduled for November 6, 2021"
• SUNY Brockport is prohibited from hosting NCAA regional or national wrestling events for five years (2022-26).

125.    Hart's statements and actions, implemented under the direction of Wilson, indicate an active and continuous pursuit of age discrimination against Murray.

126.    Following the 2017 meeting between Murray and Hart in which Hart stated that "if you don't like it, you don't have to be here, and "you [Murray] will get the message," Murray drafted a letter outlining numerous grievances that he had attempted to discuss with Hart, including dismissive statements by Athletic administrators during the Annual Review process related to Murray's "at rank" service, the unequal allocation of campus resources and facilities, and presentation of the Wrestling Program's achievements in Tuttle, the Athletic Complex on campus.

127.    Hart's preference for younger coaches was noted in Murray's letter, with no written response from Hart.

128.    In Murray's year-end review by Erick Hart, his contributions to SUNY Brockport were listed as *"at rank,"* or average, not exceeding the minimum requirements of his performance program.

129.    In response, Murray included his resume and achievements.

130.    Murray had release time of 70% KSSPE and 30% Athletics, meaning his professional commitments to his Athletic career are outweighed by his academic commitments 7:3.

131.    Despite such limited release time and his overload teaching status, Murray continually performed above and beyond his Head Coach requirements, as noted in consistently excellent performance reviews from his 50 years at the University.

132.    In the 2017 letter, Murray's request to move the Wrestling Program from its current locker room to the locker room located directly across the hall from the Wrestling facility was denied by Hart in favor of renovating the space for Ice Hockey's use, though Ice Hockey already had a locker room located inside the ice rink that easily accommodated Ice Hockey's athletes.

133.    The Wrestling Program's lockers were also falling apart with broken doors, rusted-out locker floors, and asbestos underneath the lockers themselves.

134.    Hart has also been hostile to organizations friendly to the Wrestling Program.

135.    Following an inquiry by NYWAY regarding an unforeseen cost that had not been previously discussed related to University Police presence at a NYWAY event, Hart sent the following email to NYWAY: "Please pay this or I will just invoice this as part of the facility rental and this will be the last time NYWAY uses the space"

136.    In his 2020 letter to Hart, Murray outlined the shabby treatment of the Wrestling Program compared to other Fall teams, but Hart failed to respond.

137.    Hart claims to have held a meeting with Murray on September 8, 2020, where he discussed the letter and also alleged Murray issued veiled threats to Hart and intended to violate both COVID-19 protocols and NCAA rules and regulations.

138.    The September 8, 2020 meeting did not occur.

139.    In response to COVID guidelines, Murray made arrangements to move Wrestling courses out of the Wrestling room and into the ice rink, an environment more conducive to updated guidance.

140.    Prior to the Beginning and Intermediate Wrestling classes being moved to the Ice Rink, Murray approached Hart regarding the transition.

141.    During this conversation, Hart claimed the Ice Rink could not be used because it was being utilized as a storage place for facilities, which was false.

142.    Murray spoke to Facilities, who informed him that the storage containers were not meant to be placed in the Ice Rink, but they were already in use in the X-lot of campus.

143.    Following this conversation, Murray spoke with Hart regarding the container's placement in X-lot, which Hart stated he would follow up on.

144.    When Murray did not receive a follow-up communication from Hart, Murray approached Hart again to inquire about using the ice rink.

145.    Hart instructed Murray to ask Scott Haines ("Haines"), Director of the Special Events and Recreation Center (SERC), about the possibility of using the rink.

146.     Haines informed Murray that Hart had told him not to allow Murray's academic courses into the Ice Rink, even though Hart has no jurisdiction over academic affairs.

147.     Murray confronted Hart about this statement when Hart came into his office, at which point Hart gave Murray the middle finger and walked out.

148.     Murray previously obtained all necessary approvals to utilize the space from Academic Affairs and Facilities staff.

149.     Hart's continued unprofessional behavior is another example of Hart's hostility towards Murray.

150.     On September 24th, 2016, Murray met Dr. Wilson at a pre-game reception prior to the Family Weekend football game against St. John Fisher.

151.     Dr. Wilson came down to Murray's office with him with a glass of wine afterwards to discuss the racial incident that occurred on campus earlier that week on Wednesday, September 21, 2016.

152.     Wilson was concerned that Murray asked Dr. Charles Callahan III ("Callahan") to represent the Wrestling student-athletes as opposed to the complainant.

153.     During this brief 10–15-minute meeting, Wilson also inquired as to when Murray planned to retire, to which he responded that "he had no intentions" of retiring.

154.     Following this meeting with Wilson, Murray reached out to Callahan to discuss the situation, including Wilson's inquiring as to Murray's retirement.

155.     This marked the first instance, known to Murray, of Wilson making Murray's age an issue, which was then followed by unlawful actions taken against Murray to force retirement since that date.

156.    From this meeting forward, Wilson noted her displeasure with Murray's presence at the University in a series of age discriminatory statements and encounters.

157.    In January of 2018, Dr. Mark Noll, former Faculty Senate President and Chair of the Department of Environmental Science, witnessed Wilson's stated intention to remove the Women's Gymnastics and Wrestling programs, despite their unparalleled success.

158.    During a meeting in 2019, Peter Dowe, University Registrar, noted Wilson's stated desire "to eliminate the wrestling program," but she "could not at this time because the coach of the team (Donald Murray) was in his 70's and was leaving his estate to Brockport's foundation."

159.    Dowe noted Wilson's assessment of Murray as "an eccentric old man who had no outside interests"

160.    In 2018, Wilson removed all athletic summer camps, including the Cornell "C-Brand" wrestling camp from SUNY Brockport.

161.    This camp was high-quality, well-run, and brought hundreds of youth to high school age athletes on campus.

162.    Wilson's rationale for the removal of the camp was delivered by Leah Barrett, Assistant to the Vice President, another intermediary used by Wilson to communicate that Wilson "did not want wrestling groups in the SERC" and "wrestling groups did not bring in enough revenue for the amount of space and campus staff that was needed to run the events."

163.    Through Leah Barrett, Wilson attempted to lay the blame for removing these groups on the Brockport Auxiliary Services Corporation (BASC), which was at the time overseen by Murray, who served as BASC President.

164.    Dana Weiss ("Weiss"), Executive Director of BASC, asserts to the contrary in her letter, stating that "the process for 'contracting' with these external groups is managed by the campus, and all groups need campus approval, not BASC approval, to be able to conduct their business on the campus."

165.    In 2018, Wilson attempted to remove all New York Wrestling Association for Youth (NYWAY) events from the university (see NYWAY appeal). In the letter sent by Wilson regarding the cancellations, she stated that the "organization's [NYWAY's] activities would no longer be consistent with our priorities" and that Brockport would no longer be hosting NYWAY's events.

166.    In this same letter, Wilson claimed that NYWAY did not support the University's objectives of "student recruitment, support of our academic mission, increased prestige or recognition, and financial resource development."

167.    Murray submitted an appeal to Wilson, highlighting the ways that NYWAY adhered to and exceeded expectations in every aspect listed by her in the removal letter.

168.    Despite NYWAY's substantial contributions to the university, Wilson attempted to remove them in order to target Murray and the Wrestling program.

169.    In contrast, no action has been taken against notable partners of other athletic programs at the University, with younger coaches, illustrating the age discriminatory nature of the behavior consistent with Dr. Wilson's past statements and actions.

## COUNT I

170.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 169 above, as if full set forth herein.

171.    SUNY Brockport deployed familiar age discriminatory tactics, including ageist inquiries and comments about Plaintiff's time for retirement, to pressure Murray to step down in his capacity as Head Coach of the Wrestling program at SUNY Brockport, including being asked to resign in favor of a younger individual, derogatory comments regarding Plaintiff Murray's age intended to make him feel he was harming the school financially by not retiring.

172.    Defendant SUNY Brockport's campaign to drive out Murray intensified when SUNY Brockport targeted Murray with self-reported, trumped-up National Collegiate Athletic Association ("NCAA") infractions intended to force Murray to retire, formally submitted by the University on September 12, 2020.

173.    Defendant SUNY Brockport's actions were taken against Murray and the SUNY Brockport Wrestling Program to apply pressure against Murray to step down, which he was eventually compelled to do on August 11, 2021 to retain his voice to defend himself and to protect his student-athletes from overreaching NCAA and university sanctions.

174.    Plaintiff retains a full-time faculty position at SUNY Brockport within the Kinesiology, Sports Studies, and Physical Education (KSSPE) department.

175.    Defendant SUNY Brockport's derogatory, discriminatory statements and actions have been undertaken principally by Athletic Director Erick Hart and Vice President Dr. Kathryn Wilson.

176.    Following Plaintiff's filing of a charge of age discrimination with the EEOC on May 26th, 2021, the University engaged in retaliatory behavior by, among other things, recommending a more extensive set of penalties to the NCAA as part of their Summary Disposition process.

177.     Erick Hart rendered a negative performance evaluation in July 2021 for Murray's Head Wrestling Coach position during the 2020-2021 academic year, citing alleged COVID and NCAA violations under Murray's leadership, despite the fact that Murray was exonerated by the University concerning any alleged COVID violations.

178.     Ironically, Murray was instructed and encouraged by SUNY Brockport, specifically by Associate Dean, Alisa James, and thus received express or tacit permission from the University, to teach the courses and enroll students for classes that the University and NCAA later deemed objectionable, for which the University penalized him and the SUNY Brockport Wrestling Program.

179.     Following Murray's resignation from the position of Head Coach on August 11, 2021, SUNY Brockport's Human Resources Department issued a "letter of expectations" in which it threatened Murray that "unauthorized statements may have an adverse impact on the outcome of the NCAA's investigation and the wrestling program's future," applying further pressure on Murray to remain silent or otherwise risk further actions against student-athletes, for whom Murray cared deeply.

180.     As noted, ageist comments had been directed at Murray dating back to at least 2017, demonstrating a pattern of discrimination on a continuum, and became more intense in late 2020 and 2021.

181.     The University's history of age-related comments blossomed into action in 2020 and 2021, designed to force out Murray.

182.   SUNY Brockport instigated NCAA review of Murray and SUNY Brockport's distinguished Wrestling Program, under Murray's charge, without reasonable notice or an opportunity for Murray to defend against multiple dubious infractions.

183.   SUNY Brockport's proposed NCAA penalties, implemented in 2020 and 2021, sanctioned Murray for alleged conduct entirely unrelated to the investigation at hand, as part of SUNY Brockport's campaign of discriminatory action to pressure Murray to retire.

184.   Discriminatory penalties, triggered by SUNY Brockport's self-reported investigation to the NCAA were adopted, in large part, by the NCAA.

185.   SUNY Brockport's 2021 negative performance evaluation was unjustified and discriminatory - the University had never previously issued a negative performance evaluation against Murray.

186.   In retrospect, Murray's 2017 complaint to Erick Hart, concerning a satisfactory and not superior evaluation despite placement at the NCAA National Wrestling Tournament and multiple Wrestling All-Americans, provides just one example of the University's continuing pattern of disparate treatment.

187.   SUNY Brockport disregarded multiple instances of violations among athletic programs run by younger coaches (Men's Basketball, Men's and Women's Cross-Country/Track and Field, Baseball, Football, Hockey, etc.) where, despite SUNY Brockport's awareness of misconduct, minimal repercussions and/or investigations ensued.

188.   SUNY Brockport used the NCAA, at the pleasure of the University's Vice President, Defendant Kathryn "Katy" Wilson, to discriminate against, investigate, and push Petitioner Murray toward retirement.

189.    Lacking grounds required to attempt to remove Petitioner Murray from his tenured faculty position, SUNY Brockport targeted Murray in its self-reported NCAA charges to bring enormous pressure to bear upon Murray to resign, despite his 51 years of dedicated service to the University.

190.    In the manner described herein, Defendants discriminated against plaintiff in his employment on the grounds of his age and in retaliation for filing a Complaint with EEOC and have further subjected plaintiff to a hostile work environment on the same grounds, all in violation of the ADEA.

191.    As a proximate result of defendants' continuous pattern of actions towards plaintiff, plaintiff will be deprived of future overload status compensation (approximately $4,000 per year) which will detrimentally impacts his pension and Social Security benefits, hand as suffered mental anguish and emotional injury.

**COUNT II.**

192.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 191 above, as if full set forth herein.

193.    For many years, Murray has served on the Board of Directors of the Brockport Auxiliary Service Corporation ("BASC"), an auxiliary support group to SUNY Brockport.

194.    On October 20, 2021, BASC's Executive Director Dana Weiss had a conversation with James Wall, who referred Dr. Craig Ross, a direct report to Defendant Dr. Katy Wilson, SUNY Brockport's Executive Vice President of Enrollment Management and Student Affairs, to Dr. Charles Callahan regarding the possibility of assuming a BASC Board vacancy.

195.    James Wall denied that he said anything to Dr. Ross regarding Donald Murray's "retirement."

196.    Dr. Ross related to Dr. Callahan that he "had a meeting with Jim Wall last week and I shared with him that I was interested in serving.  He suggested that I reach out to you since there is an (sic) vacant seat due to coach Murray retiring."

197.    Since James Wall did not mention anything to Dr. Ross about Murray retiring, one can reasonably infer that Dr. Ross was misinformed by his boss, Dr. Wilson, to whom Dr. Ross directly reported in his position as Cross-Divisional Budget & Facility Manager.

198.    In 2019, upon information and belief, Dr. Wilson placed Dr. Ross as temporary Co-Director of Financial Aid, with a substantial salary increase, though subsequently a search committee did not recommend him for the permanent position.

199.    The following year, Dr. Wilson created Cross-Divisional Budget & Facility Manager for Dr. Ross, directly reporting to Dr. Wilson.

200.    Dr. Wilson deployed a pattern of using loyal intermediaries or surrogates to accomplish her discriminatory practices against Murray, including her campaign to remove him from any leadership positions on campus, as recommended by SUNY Brockport to NCAA investigators.

201.    Dr. Wilson, through Dr. Ross, indirectly utilized a standard age discrimination ploy – suggesting an older worker's retirement – to retaliate against Murray, in violation of the ADEA.

202.    The foregoing facts regarding SUNY Brockport's retaliation against Murray, after he filed his DHR and EEOC administrative complaints, were provided to DHR, but DHR insisted that Murray needed to file a separate complaint.

203.    Murray incorporated the above facts regarding SUNY Brockport's retaliation in a separate November 22, 2021 administrative complaint (DHR No. 1021454; EEOC No. 16GC200570) dismissed by DHR on April 11, 2022.

204.    Seth Gilbertson, former SUNY counsel, in a December 23, 2021 written response to Murray's second DHR Complaint No. 1021454, referred to Murray's initial DHR Complaint (DHR No. 10213057) and EEOC Charge No. 525-2021-01020) and Murray's retaliation claim regarding the attempted ouster and replacement of Murray from the BASC.

205.    Seth Gilbertson, in his December 23, 2021 response to DHR, wrote that "[t]he NCAA's determination that a "show cause" order is appropriate in this case means that Complainant will be prohibited from engaging in athletically related activities for some period of time—most likely three years. *This finding and sanction should not affect Complainant's ability to serve on the Board of Directors of BASC*" (emphasis supplied).

206.    Despite Seth Gilbertson's acknowledgment that the NCAA investigation should not affect Murray' s BASC Board service, Dr. Wilson, through Dr. Ross, her protégé, sought to displace Murray, her perceived BASC opponent, and further dominate BASC's Board.

207.    Lacking any connection to the recommended penalty proposed by the University as part of the NCAA investigation, the temporal proximity of Dr. Wilson's intimation of Murray's retirement and replacement on BASC 's Board, as confirmed in Seth Gilbertson's statement confirming the lack of any association, in conjunction with the adverse employment

action detailed above, after Murray complained of age discrimination, violated the anti-retaliation provisions of the ADEA.

## COUNT III.

208.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 207 above, as if full set forth herein.

209.    The University's imposition of a "gag order", via self-reported and constructed NCAA penalties, violates Plaintiff Murray's right to free speech, guaranteed by the First Amendment to the United States Constitution and by the New York State Constitution.

210.    The University's imposition of a gag order prevents Plaintiff from advocating on behalf of student-athletes.

211.    The University's imposition of a gag order was in further retaliation for Plaintiff Murray's report of age discrimination to the EEOC and superiors at the University.

212.    The University's gag order violates the Free Speech Clause of the First Amendment of the United States Constitution, applicable to Defendants under the Fourteenth Amendment because it impermissibly chills the exercise of Murray's constitutionally protected speech, based on the content and viewpoint of his speech.

213.    SUNY Brockport's gag order imposes a prior restraint on Murray for engaging in protected First Amendment activity and preemptively penalizes Murray for engaging in protected First Amendment activity, regarding a matter of public concern.

**WHEREFORE**, Plaintiff respectfully requests that the Court grant judgment as follows: (a) On Counts I and II an injunction against the defendants from continuing or maintaining any policy, practice or custom which is discriminatory on the basis of age or

retaliation against Plaintiff and similarly situated workers; (b) On Count III, an injunction to lift the gag order imposed on Plaintiff; (c) On Count III, compensatory damages in an amount to be determined at trial; (d) On Count III, punitive damages in an amount to be determined at trial; (e) costs in this action; (f) reasonable attorney's fees; and (g) such other or further relief as this Court may deem just and proper.

**PLAINTIFF DEMANDS TRIAL BY JURY**

Dated: July 18, 2022

ZDARSKY SAWICKI & AGOSTINELLI LLP

By:   s/Gerald T. Walsh
      Gerald T. Walsh
      *Attorneys for Plaintiff Donald F. Murray*
      1600 Main Place Tower
      350 Main Street
      Buffalo, New York 14202
      (716) 855-3200
      gtwalsh@zsa.cc

33